UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ACME PLASTICS OF NEW JERSEY, INC., | : | Civil Action No. 02-5906 (SDW) |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| J & F MANUFACTURING, INC., | : |  |
|  | : |  |
| Defendant. | : |  |

---

## BRIEF IN SUPPORT OF MOTION BY DEFENDANT J & F MANUFACTURING, INC.  FOR SUMMARY JUDGMENT

---

OF COUNSEL:
    Eileen A. Lindsay

ON THE BRIEF:
    Eileen A. Lindsay
    Bernard Schenkler

ORLOFF, LOWENBACH, STIFELMAN
    & SIEGEL, P.A.
101 Eisenhower Parkway
Roseland, New Jersey  07068
(973) 622-6200
Attorneys for Defendant,
J & F Manufacturing, Inc.

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ........................................................................ ii

PRELIMINARY STATEMENT ................................................................... 1

MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE ................. 2

LEGAL ARGUMENT .............................................................................. 10

POINT I ............................................................................................... 10

THE AGREEMENT BETWEEN J & F AND ACME
IS TOO VAGUE AND UNCERTAIN TO BE ENFORCED. ....................................... 10

POINT II ............................................................................................. 17

THE COURT MAY NOT RETOOL THE ENTIRE CONTRACT TO
CRAFT A REASONABLE RESTRICTIVE COVENANT ........................................ 17

POINT III ............................................................................................ 21

ACME HAD NO LEGITIMATE BUSINESS INTEREST TO
PROTECT SUBSEQUENT TO OFFICE DEPOT'S TERMINATION
OF ITS RELATIONSHIP WITH ACME. ......................................................... 21

POINT IV ............................................................................................ 30

ENFORCEMENT OF A RESTRICTIVE COVENANT WHERE THE
LITIGANT HAS NO PROTECTABLE INTEREST IS AN UNLAWFUL
RESTRAINT OF TRADE. ........................................................................... 30

SUMMARY JUDGMENT MUST BE GRANTED IN FAVOR OF
J& F BECAUSE THE ALLEGED RESTRICTIVE  COVENANT IS
TOO VAGUE TO BE ENFORCED AND BECAUSE  ACME NO LONGER
HAS  A PROTECTABLE INTEREST ............................................................... 34

CONCLUSION ....................................................................................... 37

## TABLE OF AUTHORITIES

**PAGE**

### CASES

Anderson v. Liberty Lobby,
  477 U.S. 242 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) .................................................. 35

Baer v. Chase,
  2004 U.S. Dist. LEXIS 3954 (D.N.J. 2004) .................................................. 35

Baker v. Office Depot, Inc.,
  2004 U.S. App. LEXIS 23333 (3d Cir. 2004) .................................................. 35

Big Apple BMW, Inc. v. BMW of North America, Inc.
  974 F.2d 1358 (3d Cir. 1992) .................................................. 35

Brandon Farms Prop. Owners Assn. v. Brandon Farms Condo. Assoc.,
  180 N.J. 361 (2004) .................................................. 30

Brewer v. Marshall,
  19 N.J. Eq. 537 (E. & A. 1868) .................................................. 30

Carlo C. Gelardi Corp. v. Miller Brewing Co.,
  502 F. Supp. 637 (D.N.J. 1980) .................................................. 32

Celotex Corp. v. Catrett,
  477 U.S. 317 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) .................................................. 34, 35

Friedman v. Tappan Dev. Corp.,
  22 N.J. 523 (1956) .................................................. 12

Gibson v. Eberle,
  762 P.2d 777 (Colo. Ct. App. 1988) .................................................. 28, 29

Glantz v. Willow Supply Corp.,
  139 N.J. Eq. 523 (Ch. 1947) .................................................. 24

Heim v. Shore,
  56 N.J. Super. 62 (App. Div. 1959) .................................................. 13

Hess v. Gebhard & Co. Inc.,
  570 Pa. 148 A.2d 912 (Sup. Ct. 2002) .................................................. 26

Ingersoll-Rand Co. Ciavatta,
    110 N.J. 609 (1988) ............................................................. 18, 21

Insurance Center, Inc. v. Taylor,
    94 Idaho 896 P.2d 1252 (Sup. Ct. 1972) ................................. 19

Irving Investment Corp. v. Gordon,
    3 N.J. 217 (1949) ............................................................. 31, 32

Jersey Cent. Power & Light Co. v. Lacey Twp.,
    772 F.2d 1103 3d Cir. (1985) ................................................ 34

Jiffy Lube International, Inc. v. Weiss,
    834 F. Supp. 683 (D.N.J. 1993) ...................................... 23, 24, 33

Laidlaw, Inc. v. Student Transp. of Am., Inc.,
    20 F. Supp.2d 727 (D.N.J. 1998) ............................................ 24

LaResca v. AT&T,
    161 F.Supp.2d 323 (D.N.J. 2001) ........................................... 35

Malaker Corp. v. First Jersey Nat. Bank,
    163 N.J. Super. 463 (App. Div. 1978) ............................. 12, 13, 16

National Propane Corp. v. Miller,
    18 P.3d 782 (Colo. Ct. App. 2000) ......................................... 29

Nisonoff v. Cerebe,
    1 N.J. Super. 577 (Ch. Div. 1948) ...................................... 25, 26

Orsatti v. N.J. State Police,
    71 F.3d 480 (3d Cir. 1995) .................................................. 35

Premier Assoc. Ltd. v. Loper,
    149 Ohio App. 3d 660, 778 N.E.2d 630 (Ct. App. 2002) ................ 28

Premier Health Care Services, Inc. v. Schneiderman,
    2001 Ohio 7087, 2001 Ohio App. LEXIS 5935 (Ct. App. Ohio 2001) ...... 26

Savarese v. Pyrene Mfg. Co.,
    9 N.J. 595 (1952) ............................................................. 13

VTS Travel Enterprises, Inc. v. Spaulding,
    Superior Court Appellate Division,
    Docket No. A-3048-03 (November 17, 2004) .......................... 22, 23, 33

-iii-

Washington Constr. Co. Inc. v. Spinella,
  8 N.J. 212, 217 (1951)................................................................................................ 18

Whitmyer Bros., Inc. v. Doyle,
  58 N.J. 25 (1971)........................................................................................................ 18

## RULES

F.R.Civ. P. 56 .................................................................................................................. 34

## PRELIMINARY STATEMENT

[Emphasis ours unless otherwise indicated.]

The motion by J & F Manufacturing Inc. ("J & F") for summary judgment should be granted because the purported restrictive covenant -- that Acme Plastics of New Jersey, Inc. ("Acme") drafted -- is a three-sentence purported "agreement" that lacks essential terms and is so vague and uncertain that its meaning can be divined only by speculation and conjecture. Thus, it is entirely unenforceable.

In addition, the undisputed facts show that, as of 2001, Acme no longer had a protectable interest -- the *sine qua non* of an enforceable restrictive covenant. Once Office Depot severed its relationship with Acme, the purported non-compete agreement precluding J & F from dealing with Office Depot became unenforceable and, in fact, the agreement became a naked restraint of trade in violation of New Jersey public policy. There is no genuine issue of dispute concerning the facts that form the basis of this motion and the law is clear. Summary judgment must be granted in favor of J & F, and the Amended Complaint should be dismissed.

## MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE

J & F manufactures metal products, including shelving display units. (Exhibit A (excerpts from Verified Complaint, ¶ 5)).[1] Acme is a supplier of metal products, including shelving display units. (Exhibit A (excerpts from Verified Complaint, ¶ 7))

Four over four years, from 1997 to 2001, Acme ordered certain metal fixtures and components from J & F which, in turn, Acme then sold to its customers, one of which was Office Depot. (Exhibit A (excerpts from Verified Complaint, ¶ 7))

Before doing business with J & F, Larry Levinson, the President of Acme, did not require that Jag Singh ("Singh"), the President of J & F, agree that J & F would not sell products directly to Office Depot. (Exhibit B (excerpts from 5/16/05 Deposition of Lawrence Levinson ("L. Levinson Tr.") 150:21-25))

Other than purchase orders, Acme did not have any kind of written contract with Office Depot that obligated Office Depot to do business with Acme. (Exhibit B ( Levinson Tr. 145:11-23)) Since there was no contract between Office Depot and Acme, other than purchase orders, Office Depot had the right to stop doing business with Acme at any time. (Exhibit B ( Levinson Tr. 209:11-15)) And Office Depot had the right to stop buying metal products from Acme. (Exhibit B ( Levinson Tr. 211:6-11))

---

[1] The only facts used on this motion are in the Statement Of Facts As To Which There Is No Genuine Dispute, submitted herewith.  References to Exhibits are to the attachments to the Certification of Eileen A. Lindsay, submitted herewith.

In 1999, after J & F had been supplying metal products to Acme for almost two years, Acme forwarded a draft proposed contract, with non-compete terms prepared by Acme's counsel, to Singh, the owner of J & F to sign. (Exhibit C (Draft contract, dated 7/14/99) and Exhibit B (L. Levinson Tr. 147:10-17)) Larry Levinson read the 1999 draft proposed contract before it was sent to Singh and it had all the provisions in it that Levinson wanted (Exhibit B (L. Levinson Tr. 153:21-154:14)) Among the provisions in the 1999 draft proposed contract between J & F and Acme was a restriction against J & F's working for "Acme's customers and clients" during the term of the agreement and a post-termination restrictive covenant of three years. (Exhibit C (1999 proposed draft contract between J & F and Acme))

Levinson did not tell Singh that, unless Singh signed the contract, Acme would not do business with J & F anymore. (Exhibit B (L. Levinson Tr. 179:16-21))

Singh would not sign the contract. (Exhibit B (L. Levinson Tr. 163:5-164:5)) Notwithstanding the fact that Singh refused to sign the contract, Acme continued to purchase metal products from J & F and sell them to Office Depot. (Exhibit A (excerpts from Verified Complaint, ¶ 7))

Seven months later, after Acme had been purchasing products from J & F for almost three years, Levinson drafted a "simpler" form of contract. (Exhibit B (L. Levinson Tr. 163:5-13) and Exhibit D the "simpler" contract -- the February 28, 2000 Agreement between J & F and Acme) Levinson did not sit down and decide which terms of the 1999 draft proposed contract he was going to put in the "simpler" agreement, he just wrote the simpler agreement based on what Singh said he wanted. (Exhibit B (L.

Levinson Tr. 164:6-13)) Levinson did not even look at the 1999 draft proposed contract with respect to choosing provisions to put into the simpler agreement. (Exhibit B (L. Levinson Tr. 164:17-164:23)) When he drafted the simpler contract, Levinson put it in terms that he thought Singh would actually sign. (Exhibit B (L. Levinson Tr. 164:24-165:3))

Levinson did not show the simpler agreement to his attorney before he sent it to Singh. (Exhibit B (L. Levinson Tr. 165:4-10)) Levinson was "not concerned at all" that he might have created a document that was not enforceable. (Exhibit B (L. Levinson Tr. 163:5-164:5))

Yet, prior to forwarding the draft proposed contract to Singh, Acme had entered into non-compete agreements with employees and Levinson felt that the terms of "these types of agreements" were such that an attorney should do it. (Exhibit B (L. Levinson Tr. 159:24-160:14)) Five years before drafting the Agreement with J & F, Acme executed a non-compete agreement in 1995 with an employee, Jamie Gigantelli. (Exhibit F (Acme/Gigantelli non-compete agreement)) Acme is currently suing Gigantelli in state court for breach of that non-compete. (Exhibit H (document filed in the case))

With respect to the Gigantelli non-compete agreement, Levinson testified that there was a "twelve-month" duration limit in the agreement because "that's the way these agreements are written." (Exhibit B (L. Levinson Tr. 203:5-9)) Also, with respect to the Gigantelli non-compete agreement, Levinson testified that there was a "fifty-mile" geographic limitation "because that's common practice for these kind of agreements.

(Exhibit B (L. Levinson Tr. 203:10-13)) Further, with respect to the Gigantelli non-compete agreement, Levinson testified that there are mileage restrictions in restrictive covenant agreements because "I don't think you want to be in a position where you would have an individual not be able to work anywhere in the world. So you just make it reasonable." (Exhibit B (L. Levinson Tr. 203:15-204:15)) Finally, with respect to the Gigantelli non-compete agreement, Levinson testified that duration terms are put in restrictive covenant agreements because "you don't want to prevent them from earning a living for an excessive amount of time. I think that's fair." (Exhibit B (L. Levinson Tr. 204:17-205:1))

Acme and J & F executed the "simpler" Agreement dated February 28, 2000 ("the Agreement")(Exhibit D (the February 28, 2000 Agreement) and Exhibit A (excerpts from Verified Complaint, ¶ 7). There was no good reason why Jared Levinson's signature appears on the Agreement, rather than his father, Larry Levinson's signature, "except he [Jared] typed it." (Exhibit B (L. Levinson Tr. 167:14-18))

Levinson approved the wording of the Agreement before it was sent over to Singh. (Exhibit B (L. Levinson Tr. 163:5-164:5)) Levinson had no discussion with Singh before Singh signed the Agreement and sent it back. (Exhibit B (L. Levinson Tr. 168:6-17))

After the introduction naming the parties, the Agreement consists solely of two sentences: "J & F Manufacturing is an independent contractor that performs work for Acme's customer Office Depot. J & F Manufacturing agrees that it will not solicit

and/or sell products directly or indirectly to Office Depot, Inc." (Exhibit A (excerpts from Verified Complaint, ¶ 7))

What Levinson meant by the words "independent contractor" in the Agreement was that J & F was a vendor of Acme and was not a part of Acme. (Exhibit B (L. Levinson Tr. 171:3-8)) What Levinson meant by the word "work" in the second sentence of the Agreement is that "anything he [Singh] would do for Office Depot would go through Acme Plastics." (Exhibit B (L. Levinson Tr. 184:5-8))

Levinson admits that the Agreement does not have a definition section. (Exhibit B (L. Levinson Tr. 178:8-14)) Levinson admits that the Agreement does not have a duration provision. (Exhibit (L. Levinson Tr. 171:16-18)) As to why the Agreement does not have a duration provision, Levinson testified that it "just doesn't have one. (Exhibit B (L. Levinson Tr. 171:16-20))

Levinson testified that the term of the Agreement commenced on the date of the Agreement. (Exhibit B (L. Levinson Tr. 172:6-9)) When asked when the Agreement would end, Levinson testified, "there's no date in here, but reasonableness might be three years, five years, something like that." (Exhibit B (L. Levinson Tr. 172:10-14)) Notwithstanding that, Acme's expert report seeks damages of $3,734,496, covering a nine-year period ending July 31, 2010 because J & F started dealing directly with Office Depot in 2001. (Exhibit E (excerpts from expert report of Charles Baker on behalf of Acme))

As to what the geographic limitation was under the Agreement, Levinson testified that the area was anywhere in the world. (Exhibit B (L. Levinson Tr. 187:20-

-6-

190:24))   Indeed, Levinson testified that J & F could not have done business with an Office Depot store in California, even if Acme had never done business with that Office Depot store in California.  (Exhibit B (L. Levinson Tr. 187:20-190:24))

When asked what the word "indirectly" meant in the last sentence of the Agreement, Levinson testified that "indirectly would mean through any other party other than the parties listed, other than Acme Plastics."  (Exhibit B (L. Levinson Tr. 192:12-14))  In that regard, when it was pointed out to Levinson that the document does not set forth that J & F could sell "indirectly" to Office Depot through Acme -- and, indeed, was already doing so -- Levinson agreed that the words "except through Acme" are not stated but "implied" at the end of the last sentence.  (Exhibit B (L. Levinson Tr. 197:19-198:15))

Acme and its subsidiaries do not have any obligations under the Agreement.  (Exhibit B (L. Levinson Tr. 178:8-14))  There was no agreement between Acme and J & F that Acme would only buy metal products from J & F.  (Exhibit B (L. Levinson Tr. 184:18-21))  Acme simply was not bound by the Agreement not to buy metal from sources other than J & F.   (Exhibit B (L. Levinson Tr. 185:9-14))

While Acme and its subsidiaries had no obligations under the Agreement, J & F had an obligation: "not to solicit and/or sell Products directly or indirectly to Office Depot."  (Exhibit B (L. Levinson Tr. 187:2313-19))  When asked what consideration J & F had received for entering into the Agreement with Acme, Levinson answered, "We were probably his best customer at that time or one of his top customers and he wanted it to continue that way and so did I."  (Exhibit B (L. Levinson Tr. 184:15-17))

-7-

Yet, Levinson did not tell Singh that, unless Singh signed the Agreement, Acme would not do business with J & F anymore. (Exhibit B (L. Levinson Tr. 179:23-180:1)) Indeed, it was not Levinson's intent that, if Singh did not sign the Agreement, Acme would not do business with J & F any more. (Exhibit B (L. Levinson Tr. 179:23-180:1))

Levinson testified that, even if Acme did not pay J & F for the work that it did for Office Depot under the Agreement, J & F would not have had the right to seek payment from Office Depot. (Exhibit B (L. Levinson Tr. 185:15-186:12))

Levinson testified that J & F was bound by the Agreement not to deal directly or indirectly with Office Depot even if Office Depot stopped doing business with Acme. (Exhibit B (L. Levinson Tr. 206:113:5-9)) When asked where he saw in the Agreement that J & F was bound by the Agreement not to deal directly or indirectly with Office Depot even if Office Depot stopped doing business with Acme, Levinson testified, "It's not that I see it. It's that I don't see it. Because it does not talk about that." (Exhibit B (L. Levinson Tr. 206:11-23))

Neil Aportadera of Office Depot testified that, as a result of the fact that he discovered, in September 2001, that Acme had lied to Office Depot when it represented that it owned its own metal facility, he would not give Acme any more metal business (except what was committed to). (Exhibit G (excerpts from the 12/16/04 Deposition of Neil Aportadera)) Levinson testified that Neil Aportedera of Office Depot was not lying when Neil said at his deposition that he would not give Acme any more metal business, but Levinson believed that they "could have worked the problem out." (Exhibit B (

Levinson Tr. 231:10-18))  Acme's sales to Office Depot in 2001 were $6,155,190; in 2002 Acme's sales to Office Depot dropped to $1,286,156.  ((Exhibit E (excerpts from expert report of Charles Baker on behalf of Acme))[2]

---

[2] We agree with this fact solely for purposes of this motion for summary judgment.

# LEGAL ARGUMENT

## POINT I

### THE AGREEMENT BETWEEN J & F AND ACME IS TOO VAGUE AND UNCERTAIN TO BE ENFORCED.

The restrictive covenant that Acme seeks to enforce is embodied in two vague and indefinite sentences at the conclusion of a one-half page document:

> J and F Manufacturing is an independent contractor that performs work for Acme's customer Office Depot, Inc.   J and F Manufacturing agrees that it will not solicit and/or sell products directly or indirectly to Office Depot, Inc.

The two-sentence Agreement fails to express numerous material terms, rendering it impossible for this Court to enforce the Agreement.   Among the ambiguities are the following:

1. What is the duration of the Agreement, *i.e.*, when do the obligations imposed by the Agreement end?

2. How do the obligations imposed by the Agreement end?

3. There are no geographical limits.  Are all Office Depot stores world-wide intended to be covered by the Agreement, or just the Office Depot stores to which Acme provided product?

4. What "products" are covered by the Agreement?  Are all products made by J & F included, or only the kind of products that Acme was selling to Office Depot?

5.   What was the consideration, if any, to J & F?[3]

6.   What are J & F's obligations?

7.   Was J & F bound to sell product only to Acme?  If not, how was J & F to know whether an entity to whom J & F sold product would not, in turn, sell it on to Office Depot (a breach of the "indirectly" component)?

8.   Does Acme have any obligations to J & F?

9.   Who is to pay J & F?

10. Does Office Depot have any obligations to J & F?  (If Acme did not pay J & F, did J & F have a right over against Office Depot for payment, even thought the Agreement provides that Office Depot is "Acme's customer"?)

11. J & F sold products "indirectly" to Office Depot through Acme, yet the last sentence prohibits precisely what J & F was doing.

12.  Is the restriction effective subsequent to the termination of any relationship between J & F and Acme?

13.  How does such a relationship terminate?

14.  Is the restriction effective subsequent to the termination of any relationship between Acme and Office Depot?

---

[3] "To be enforceable, a contract must also be accompanied by consideration." Excelsior Ins. Co. v. Pennsbury Pain Ctr., 975 F. Supp. 342, 349 (D.N.J. 1996); see Meurer Steel Barrel Co. v. Martin, 1 F.2d 687, 688 (3d Cir. 1924) ("Consideration is an essential ingredient of a contract."); Borbely v. Nationwide Mut. Ins. Co., 547 F. Supp. 959, 980 (D.N.J. 1981) ("To be enforceable, a contract must be supported by valuable consideration."). J & F received no consideration for entering into the contract and Levinson admits that he never intended that he would stop doing business with J & F if Singh did not sign the Agreement.

Even before this Court attempts to address whether the noncompetition agreement is reasonable or whether Acme has a protectable interest, the Court must determine that the Agreement is "sufficiently definite in its terms that the performance to be rendered by each party can be ascertained with reasonable certainty." Friedman v. Tappan Dev. Corp., 22 N.J. 523, 530 (1956).[4] The two sentences woefully fail to meet this required standard.

In Malaker Corp. v. First Jersey Nat. Bank, 163 N.J. Super. 463 (App. Div. 1978), certif. den. 79 N.J. 488 (1979), the plaintiff claimed that the bank breached an oral and written contract to give an unrestricted $2.0 million line of credit. While the bank did loan substantial monies to the plaintiff, the bank refused to make certain other loans and the plaintiff brought suit for damages. The Appellate Division concurred with the trial court that the "agreement" was too vague for enforcement as a matter of law, noting that the "infirmities" included the lack of duration, rate of interest, compensation for the loan, the collateral, the form of loans, and the terms of repayment. The Appellate Division held that "no trier of fact could determine, **without sheer speculation**, whether the bank complied or breached this undertaking." 163 N.J. Super. at 474.

---

[1] Restatement (Second) Contracts §33(2) describes the term "certainty" as follows: "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy."

The Court in <u>Malaker</u> continued:

> A contract so vague in the description of performance of each
> party thereto is incapable of remedy at law or equity. . . .An
> essential characteristic of an enforceable contract is that its
> obligations be specifically described in order to enable a court
> or a trier of fact to ascertain what it was the promissor
> undertook to do.

163 N.J. Super. at 474.  This Court, also, would have to speculate as to what terms the

parties intended because the Agreement is vague as to the essential components of the

agreement between the parties.

Likewise, in <u>Heim v. Shore</u>, 56 N.J. Super. 62 (App. Div. 1959), the

contract required that real estate be conveyed "under a liberal mortgage plan," without

specifying the terms of the mortgage, amortization, interest, nor the type of deed, or even

the purchase price.  The Appellate Division affirmed the dismissal of the specific

performance claim holding:

> While it is therefore clear that the parties thought and acted as
> if they had a contract, the recipe for the making of a binding
> contract requires if not absolute definiteness and certainty on
> essential terms, at least expressions of assent sufficient to
> permit reasonable implications to be drawn as to the
> performance to be rendered. Parties are not bound by what
> they think, but rather by what they say.

56 N.J. Super. at 71.  Here, too, the Agreement lacks definiteness and certainty and

reasonable implications cannot be extracted from it.

In <u>Savarese v. Pyrene Mfg. Co.</u>, 9 N.J. 595 (1952), the Supreme Court held

that an oral agreement that "you will have a foreman's job for the rest of your life,"

alleged to be an inducement to play on the company's baseball team, was not enforceable

because of its vagueness and uncertainty and affirmed the grant of summary judgment in favor of the defendant.  Among the deficiencies noted by the Supreme Court were that no salary was agreed upon, no provision was made if the plaintiff was unable to perform his duties, it was not stipulated if salary was ever to be increased or decreased, no mention was made of the effect of any disability whether or not it was related to the baseball team and that "many other possible future contingencies were not covered by or provided for in the agreement made." 9 N.J. at 599-600.  The Agreement that Acme seeks to have this Court enforce is similarly a model of vagueness and uncertainty.

Likewise, in Baer v. Chase, the New Jersey District Court granted summary judgment in favor of the defendant because "the essential terms of the contract can not be determined, that the alleged agreement is too indefinite to allow the Court to ascertain with reasonable certainty what each party agreed to do, and that the contract can not be enforced." 2004 U.S. Dist. LEXIS 3954, *24.

In Baer, the plaintiff alleged that he created the idea for the television program "The Sopranos," and that the producer, David Chase, orally promised that plaintiff would be "taken care of" or words to that effect, if the show were successful. The District Court found that the purported agreement did not "contain sufficiently precise terms to constitute an enforceable agreement" 2004 U.S. Dist. LEXIS 3954, *19, because no amount or manner of compensation was specified, there was no meaning of "success," there was no definition of profits, and the contract did not contemplate dates of commencement or termination. Here, also, the Agreement did not define critical words and the contract did not set forth any dates of commencement or termination.

-14-

On appeal, the Court of Appeals held that "the district court was correct in holding that the contract Baer alleges was too ambiguous and indefinite to be enforceable." 392 F.3d at 618. Baer then argued that there was an implied-in-fact contract if not an express contract. The Court of Appeals held that there can be no such implied-in-fact contract in the face of an express agreement governing the same subject matter, 392 F.3d at 616, but even if there were such an implied-in-fact agreement, it would still be too indefinite to enforce. 392 F.3d at 620. The Court explained:

> Nothing in the record indicates that the parties agreed on how, how much, where, or for what period Chase would compensate Baer. The parties did not discuss who would determine the "true value" of Baer's services, when the "true value" would be calculated, or what variables would go into such a calculation. There was no discussion or agreement as to the meaning of "success" of The Sopranos. There was no discussion how "profits" were to be defined. There was no contemplation of dates of commencement or termination of the contract. And again, nothing in Baer's or Chase's conduct, or the surrounding circumstances of the relationship, shed light on, or answers, any of these questions. The district court was correct in its description of the contract between the parties: 'The contract as articulated by the Plaintiff lacks essential terms, and is vague, indefinite, and uncertain; no version of the alleged agreement contains sufficiently precise terms to constitute an enforceable contract' . . . We therefore will affirm the district court's rejection of Baer's claim to recover under a theory of implied-in-fact contract.

392 F.3d at 621. The <u>Baer</u> standard -- that a contract's terms must be sufficiently definite to be enforceable -- is not met here.

Under the standards articulated by these courts, the purported "agreement" between J & F and Acme is so uncertain that it cannot be enforced. Indeed, the deficiencies and omissions of the two-sentence purported "agreement" can be measured

-15-

or contrasted with what was **not** agreed upon eight months earlier. In July 1999, Acme proposed a detailed ten-page contract to J & F. The proposal detailed the respective duties of the parties, the compensation, bidding on projects, and a detailed three-year restrictive covenant relating to "Acme's customers and clients." J & F flatly refused to sign this proposal.

The 1999 proposal, which was rejected by J & F, provided for a restriction against J & F working for "Acme's customers and clients" during the term of the agreement and a post-termination restrictive covenant of three years. Since the two-sentence agreement did not reference a restriction "during the term of the agreement," is it effective only after the agreement terminates? And since J & F rejected a three-year restrictive covenant in the 1999 draft, how long was the restriction supposed to last in the Agreement?

The uncertain and indefinite terms and conditions of the relationship between J & F, Acme and Office Depot, present and future, due to the vagueness of the Agreement leave to "sheer speculation" whether the parties have complied with or breached their undertaking. Malaker, 163 N.J. Super. at 474. There simply is no enforceable contract.[5]

---

[5] It must also be borne in mind that any ambiguity resulting from a deliberate choice of contractual language will be interpreted most strongly against the party who wrote it. In re F.H. McGraw & Co., 473 F.2d 465, 468 (3d Cir.), cert. den. sub nom., F.H. McGraw & Co. v. Fellows Corp., 414 U.S. 1022, 94 S.Ct. 443, 38 L.Ed.2d 212 (1973) (citing Williston, Selections on Contracts, Student Edition §621; Restatement, Contracts §236); see Newport Assocs. Dev. Co. v. Travelers Indemn. Co. of Ill., 162 F.3d 789, 794 (3d Cir. 1998) (quoting United States v. Seckinger, 397 U.S. 203, 216, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970) (recognizing the doctrine of contra preferentum, "which states that 'as between two reasonable and practical constructions of an ambiguous contractual provision, the provision should be construed less favorably to that party which selected the contractual language.'")); Atlantic City Racing Ass'n v. Sonic Financial Corp., 90 F.Supp.2d 497, 506 (D.N.J. 2000) ("Where ambiguities appear in the contract, they are to be strictly construed against the drafter."). Lawrence Levinson admits that he wrote the Agreement.

## POINT II

## THE COURT MAY NOT RETOOL THE ENTIRE CONTRACT TO CRAFT A REASONABLE RESTRICTIVE COVENANT.

The New Jersey courts have adopted a rule that permits enforcement of a restrictive covenant to the extent that the restriction protects a legitimate interest and is otherwise fair and reasonable. Even under the most lenient and equitable standards, however, a court may not craft an agreement that imposes the Court's views in order to remedy the parties' own failure to agree upon definite and essential terms and conditions.

The restriction contained in the purported two-sentence "agreement" between Acme and J & F is so vague and indefinite that enforcement would call for the Court to conjure and rewrite the entire contract -- including essential terms -- a task that the parties themselves could not manage to accomplish.

Prior to Solari Industries, Inc. v. Malady, 55 N.J. 571 (1970), courts in New Jersey held that a noncompetition agreement without express geographical or time limitations may be void *per se* and not in any part enforceable. After reviewing the growing jurisprudence that permits partial enforcement, the Supreme Court held:

> We are entirely satisfied that the time is well due for the abandonment of New Jersey's void *per se* rule in favor of the rule which permits the total or partial enforcement of noncompetitive agreements to the extent reasonable under the circumstances.

55 N.J. at 585.

The Solari court held that the plaintiff employer was entitled to enforce

that limited measure of relief within the terms of the noncompetitive agreement which is reasonably necessary

-17-

> to protect their legitimate interests, will cause no undue
> hardship on the defendant, and will not impair the public
> interest.

Id.

In Solari, the restrictive employment covenant prohibited the employee from selling products in competition with the Italian employer for one year after termination of his employment, without any geographic restriction. The Supreme Court suggested that on remand, the employer's legitimate interests would be protected by limiting the restraint to the employer's customers in the United States with whom the employee had actual dealings.

Subsequently, in Whitmyer Bros., Inc. v. Doyle, 58 N.J. 25 (1971), the Supreme Court established what is now known as the Solari/Whitmyer test for determining whether a noncompete agreement is unreasonable and, therefore, unenforceable. Under the Solari/Whitmyer test, a noncompete agreement is enforceable if it (1) protects the legitimate interests of the employer, (2) imposes no undue hardship on the employee and (3) is not injurious to the public. Whitmyer, 58 N.J. at 32-33.

While Solari rejected any mechanical application of the enforcement of a restrictive covenant based on whether the contract language was divisible or indivisible, 55 N.J. at 576, its principles cannot be utilized to bootstrap a judicial rewriting upon an entirely deficient and indefinite agreement. To do so would contravene a fundamental precept that "the court will not make a different or better contract than the parties themselves have seen fit to enter into." Washington Constr. Co. Inc. v. Spinella, 8 N.J. 212, 217 (1951).

-18-

Further, in <u>Baer v. Chase</u>, the plaintiff requested that the court "clarify ambiguities" in order to cure the deficiencies. The New Jersey District Court responded: "The plaintiff is not merely asking the Court to simply 'plug gaps,' he is asking it to construe essential terms where there are none, and then write the contract for the parties. The Court will not do so." 2004 U.S. Dist. LEXIS 3954, *24. The Court of Appeals in <u>Baer v. Chase</u> observed that, because of its indefiniteness, "There is a point, however, at which interpretation becomes alteration." 392 F.3d at 620.

In <u>Insurance Center, Inc. v. Taylor</u>, 94 Idaho 896, 499 P.2d 1252 (Sup. Ct. 1972), the Idaho Supreme Court considered the enforcement of a covenant that precluded a former insurance agent from selling insurance to any of the insureds or to any member of an association or group serviced by the Agency. The Supreme Court in <u>Taylor</u> cited to <u>Solari</u> as authority to modify restrictive covenants based on equitable principles, but held that in so doing, it was not permissible to rewrite essential terms:

> in order for this district court to afford protection to the respondent's legitimate business interest, it became necessary for that court to strike from the challenged paragraph 7 the following "or to any member of an association or group serviced by the Agent." Moreover, the district court then had to supply the geographical limitations for the paragraph, and, as well, supply the time within which such a restriction could be enforced.
>
> Even though this Court accepts the principal that a trial court may in a proper case modify a restrictive covenant, **nevertheless the covenant in question here was so lacking in the essential terms which would protect the employee, namely a limitation on time, area, and scope of activity, that the covenant is as a matter of law unenforceable. The trial court did not modify the**

-19-

> **covenant--it had to supply the essential restrictions to make it reasonable**.

90 Idaho at 900, 499 P.2d at 1256.

This Court's equitable power under the Solari/Whitmyer standards are not so broad that it can make a silk purse of a contract out of the sow's ear of indefiniteness and uncertainty that is the two sentence Agreement before the Court. This Court cannot, under the law, make a better contract than the parties themselves made, or supply essential terms to which the parties themselves could not and did not agree. Speculation and conjecture do not form a basis upon which the Court may grant

> that limited measure of relief **within the terms of the noncompetitive agreement** which is reasonably necessary to protect their legitimate interests, will cause no undue hardship on the defendant, and will not impair the public interest

Solari at 55 N.J. 585.

## POINT III

## ACME HAD NO LEGITIMATE BUSINESS INTEREST TO PROTECT SUBSEQUENT TO OFFICE DEPOT'S TERMINATION OF ITS RELATIONSHIP WITH ACME.

The sole basis for Acme's legitimate interest in restraining competition vanished when Office Depot determined to stop doing business with Acme. Therefore, another reason that the Agreement is not enforceable is that Acme no longer had a legitimate interest to protect once Office Depot severed the relationship.

A restrictive agreement that merely stifles competition is unenforceable. Ingersoll-Rand Co. v. Ciavatta, 110 N.J. 609, 635 (1988). Restrictive covenants which are "principally directed at lessening competition," are not enforceable; rather, "[a]ny restrictive covenant, if it is to be judicially enforced, must be directed at protecting the employer's legitimate interests." Ingersoll at 629 (*citing* Raven v. A. Klein & Co., Inc., 195 N.J. Super. 209, 213 (App. Div. 1984)). This legal precept is in tandem with the Solari/Whitmyer test, which limits enforceability of a restrictive covenant only to the extent that it **protects the legitimate interests of the employer.** Whitmyer, 58 N.J. at 32-33.

The Ingersoll Rand court noted that the courts focus on the legitimate interests of the employer and the hardship of the employee:

> In cases where the employer's interests are strong, such as cases involving trade secrets or confidential information, a court will enforce a restrictive agreement . . . Conversely, **in cases where the employer's interests do not rise to the level of a proprietary interest deserving of judicial protection, a court will conclude**

**that a restrictive agreement merely stifles competition and therefore is unenforceable.**

110 N.J. at 635.

A recent unpublished decision of the Appellate Division, <u>VTS Travel Enterprises, Inc. v. Spaulding,</u> Superior Court Appellate Division, Docket No. A-3048-03 (November 17, 2004) considered a claim with similarity to the claim made by Acme. In 1999, VTS contracted with Datascope Corporation to become an exclusive on-site travel department for Datascope. VTS, in turn, hired two employees as travel consultants and required them to sign restrictive covenants precluding future employment within 5 miles of the location for a period of three years. In 2002, Datascope did not renew the contract with VTS but, instead, contracted with American Express One to become its exclusive on-site travel department. The two former VTS employees were hired by American Express One.

VTS then commenced an action against the two former employees to enforce the restrictive covenant and for liquidated damages. The trial court granted summary judgment to the defendants finding "... .**the restrictive covenant unenforceable because it did not advance plaintiff's legitimate business interest** and imposed an undue hardship upon defendants." (Slip Op. 2). The Appellate Division affirmed. After reciting the <u>Solari</u> and <u>Whitmyer</u> tests, the Appellate Division concluded that:

> Judge Donohue properly found, under the circumstances, that the restrictive covenant was unreasonable as it did not advance any legitimate business interest of plaintiff . . . Plaintiff's customer

-22-

> Datascope did not renew its exclusive contract with plaintiff, choosing instead to enter into an exclusive contract with another travel agency. Because the contract was exclusive, defendant's employment with American Express One did not place them in direct competition with their former employer. . . .

> Quoting from plaintiff's president, Vincent E. Citti, that "we don't wish to have our employees raided by another company if they found out that they're good and able," Judge Donahue aptly noted that courts will not enforce restrictive covenants that are "principally directed at lessening competition" or that impose undue hardship by preventing employees from using general knowledge gained during employment . . . the restrictions sought to be imposed were intended essentially to prevent defendants from seeking similar employment elsewhere.

(Slip op. at 8-9).

Thus, just as Datascope had jettisoned VTS, Office Depot jettisoned Acme. Once the exclusive contract had been terminated by Datascope, VTS lost the protectable interest it had in enforcing the restrictive covenant. Likewise, once Office Depot decided to stop giving metal business to Acme, Acme lost its protectable interest. All that VTS -- and Acme -- had left was an unreasonable restraint on competition, *i.e.*, a restraint with no legitimate protectable interest. Because Acme had no further legitimate interest to protect, the restrictive covenant in the Agreement is not enforceable.

The Court in Jiffy Lube International, Inc. v. Weiss, 834 F. Supp. 683 (D.N.J. 1993), applied the Solari/Whitmyer test to a franchised business. The franchise agreement contained a covenant that restrained business competition for three years and within 10 miles of any other Jiffy Lube franchisee. The District Court held that the franchise had been properly terminated because of misrepresentations by the franchisee,

-23-

and applied the three-pronged Solari test to determine that Jiffy Lube held a protectable

interest in the location. However, the protectable interest was limited:

> Once Jiffy Lube has placed a new franchisee in the Turnersville
> area, or sufficient time has passed to permit the establishment of a
> new franchisee, **Jiffy Lube's legitimate interest in preventing**
> **competition from the Weisses, under their own name or mark,**
> **essentially disappears, and the covenant becomes an**
> **impermissible restraint of trade**. Ten months is more than
> sufficient time for Jiffy Lube to find and set up another franchisee in
> the Turnersville area -- from any competition from the defendants.

834 F. Supp. at 692.

Likewise, in Laidlaw, Inc. v. Student Transp. of Am., Inc., 20 F. Supp.2d

727 (D.N.J. 1998), the District Court, applying New Jersey law, noted that restrictive

covenants ancillary to a sale of a business were enforceable, but that the Solari/Whitmyer

test should still be performed, "albeit more flexibly." 20 F. Supp. 2d at 754.   In Laidlaw,

the plaintiff had sought to enforce a covenant against competition for publicly-bid

transportation contracts.  The District Court held that because nine years had elapsed

since the sale of the business and its goodwill, "Laidlaw no longer has a protectable

interest in the goodwill . . . Laidlaw is not entitled to any more protection." 20 F. Supp.

2d at 757.

A restrictive covenant simply cannot survive the lapse of the protectable

interest involved.  Thus, in Glantz v. Willow Supply Corp., 139 N.J. Eq. 523 (Ch. 1947),

the owners of an advertising supply company ceased doing business and sold all its

inventory to a competitor under an agreement that included the seller's three-year

covenant no to compete.   The seller then resumed its business within the three-year

period, and the buyer sued to enforce the restrictive covenant. The Court found that

"[t]he purpose of the covenant was to give complainants the opportunity of disposing of

the stock bought from defendants, unhampered by defendant's competition," 139 N.J. Eq.

at 527, and that six months to a year seemed long enough to dispose of the inventory. The

Court continued:

> Even though the restraint was reasonable and the contract
> valid, **yet it appeared at the hearing that the object of the
> covenant had been accomplished**, that complainants, in the
> ordinary course of trade, had disposed of everything they had
> bought from defendants except a small amount of obsolete
> material.

The Court concluded:

> **When that purpose of object, which the parties had in mind
> and which alone gives the contract life, has been
> accomplished before the court is asked to act, the court
> should decline to enforce the covenant.**

139 N.J. Eq. 528.

Acme's only protectable interest was its relationship with Office Depot.

Once that relationship ended, Acme had no further protectable interest and a lapsed

covenant is a restraint on trade. Ingersoll Rand, 110 N.J. at 629.

Moreover, a restrictive covenant has no "distinct property right independent

of the business it was designed to safeguard and unless it is incident to that business, it

cannot exist." Nisonoff v. Cerebe, 1 N.J. Super. 577, 580 (Ch. Div. 1948). Restrictive

covenants "derive their vitality and beneficial value solely by reason of their association

with the business sought thereby to be protected from competitive invasion." Id.

In Nisonoff, a restrictive covenant was held to be extinguished after the business changed hands and then was revested in the original seller.  Likewise, Acme's restrictive covenant is no longer associated with the object sought to be protected, *i.e.*, its relationship with Office Depot.  Therefore, the restrictive covenant in the Agreement has no independent vitality.  Once Acme had no business relationship with Office Depot to protect, it had no legitimate right to preclude J & F from dealing with Office Depot.

Numerous decisions in other jurisdictions also hold that a noncompetiton agreement is no longer enforceable once the protectable interest lapses or has been terminated.  Thus, in Hess v. Gebhard & Co. Inc., 570 Pa. 148, 808 A.2d 912 (Sup. Ct. 2002), the Pennsylvania Supreme Court held that an insurance agent's noncompetition covenant was no longer enforceable after the business was sold:

> Because Hoaster has sold the insurance accounts and is no longer in the insurance business, **Hoaster has no legally protectable business interest in those insurance accounts. Without a protectable business interest, Hoaster may not enforce the covenant not to compete.**

570 Pa. at 168.

Where the protectable interest -- a contract with a third party -- was terminated by the third party (as was the case at bar, where Office Depot terminated its relationship with Acme), an Ohio appellate court held that a noncompetition agreement was no longer enforceable.  Premier Health Care Services, Inc. v. Schneiderman, 2001 Ohio 7087, 2001 Ohio App. LEXIS 5935 (Ct. App. Ohio. 2001) app. denied 96 Oho St. 3d 1448, 2002 Ohio 2512, 771 N.E.2d 261 (Supt. Ct. 2002).  In Premier Health, the hospital had contracted with an emergency trauma group to operate the emergency room.

-26-

The trauma group's physicians signed a restrictive covenant that they would not work for the hospital for one year after leaving the trauma group. When the hospital terminated the trauma group's contract, some of the doctors began to work for another trauma group that serviced the hospital. The original trauma group filed an order to show cause for an injunction to enforce the restrictive covenant.

The Ohio appellate court affirmed the trial's court's denial of the injunction because the original trauma group had no further protectable interest once the contract with the hospital had been terminated:

> this legitimate business interest no longer existed because MVH had terminated the contract with Appellants. Also, MVH would no longer contract with Appellants because of this experience but was instead consulting other providers in case the injunction was granted…Therefore, **since the contract between MVH and Appellants was terminated at the time of the request for the injunction, Appellants no longer had a legitimate business interest in protecting and preserving the contract.**

2001 Ohio App. LEXIS 5935, *15.

The original trauma group argued that it had an interest in not having competition in the area when it solicits new doctor-employees. The appellate court held: "Preventing ordinary competition is not a legitimate business interest which can be protected by a restrictive covenant." Id. at *19. Thus, the Court concluded that "Appellants cannot articulate a legitimate business interest which would be protected by an injunction enforcing the restrictive covenant." Id. at *20. Here, any legitimate interest of Acme expired once the Office Depot relationship was terminated by Office Depot.

-27-

Acme simply no longer held a protectable interest in preserving its business relationship with Office Depot after that point.

Finally, several decisions in other jurisdictions have held that, upon abandonment of a business, there was no further protectable interest to enforce a noncompetition agreement. For example, in Premier Assoc. Ltd. v. Loper, 149 Ohio App. 3d 660, 778 N.E.2d 630 (Ct. App. 2002), app. denied, 98 Ohio St. 3d 1537, 786 N.E.2d 900 (Sup. Ct. 2003), a psychologist signed a restrictive covenant with a company that provided services to nursing homes. After the company cancelled its contracts with the nursing homes, the psychologist began servicing the nursing homes directly. Later, the company decided to assign its business to a new company that sought to enforce the covenant against the psychologist. The Ohio appellate court held that it would be unfair and unjust to enforce the agreement where the employer had abandoned the business, even though the employer later changed his mind.

The Loper court cited with approval to a Colorado case, Gibson v. Eberle, 762 P.2d 777 (Colo. Ct. App. 1988), in which the employer had gone out of business but still attempted to enforce a restrictive covenant against a former employer. The Loper Court held:

> The court noted that the right to enforce a covenant ends with the termination or abandonment of the business to which the covenant was ancillary." *[762 P.2d at] 779.* Such abandonment extinguishes the covenant....*Gibson* is instructive that **an employer which abandons its business may not enforce a covenant not to compete.**

149 Ohio. App. 668.

The precepts of the Gibson case were re-iterated more recently in National Propane Corp. v. Miller, 18 P.3d 782 (Colo. Ct. App. 2000), cert. den. 2001 Colo. LEXIS 213 (Colo. Sup. Ct. 2001). The Court in National Propane held, *inter alia*, that a noncompetition agreement was no longer enforceable once the company ceased its business:

> The right to enforce a noncompetition covenant ancillary to the sale of a business ends with the termination or abandonment of the business to which the covenant was ancillary. Once the protected business is liquidated and its goodwill abandoned, enforcement of the covenant constitutes a void and unenforceable restraint of trade.

18 P.3d at 786.

These decisions embody the Solari/Whitmyer concept that there must be a legitimate, protectable interest in order for a Court to enforce a restrictive covenant. In each instance, though the business or employer may have held a protectable interest at an earlier point in time, that legitimate interest was lost either through the sale, termination or abandonment of the business.

Here, to the extent that Acme's two-sentence "agreement" with J & F could ever be said to have constituted an enforceable restrictive covenant, any protectable interest that Acme held at an earlier time -- based entirely on its business relationship with Office Depot -- evaporated the moment Office Depot terminated its relationship with Acme. Therefore, Acme's continued attempt to enforce the purported restrictive covenant -- through the year 2010 -- must be viewed as simply an attempt to "stifle competition." Ingersoll Rand, 110 N.J. at 635. The Agreement is unenforceable.

-29-

## POINT IV

## ENFORCEMENT OF A RESTRICTIVE COVENANT WHERE THE LITIGANT HAS NO PROTECTABLE INTEREST IS AN UNLAWFUL RESTRAINT OF TRADE.

Since Acme ceased having a protectable interest in the relationship it once had with Office Depot, the restrictive covenant that Acme maintains prohibits J & F from transacting business with Office Depot is not enforceable. The bare covenant not only creates an unreasonable restraint on trade, it is against the public policy of New Jersey. Contracts that restrain trade are among the classes of illegal contracts that the New Jersey Supreme Court has declared void:

> We have declared void contracts that violate statutes, promote crime, interfere with the administration of justice, encourage divorce, violate public morality and restrain trade . . . The sources of public policy include federal and state legislation and judicial decisions.

Brandon Farms Prop. Owners Assn. v. Brandon Farms Condo. Assoc., 180 N.J. 361, 374-5 (2004).

For almost 150 years, New Jersey courts have held that restraints against trade -- beyond what is reasonably necessary to protect the interests of the other party -- are unlawful and unenforceable. Thus, Brewer v. Marshall, 19 N.J. Eq. 537 (E. & A. 1868), citing century-old English precedent, held that a covenant that prohibited a property owner from selling limestone dug from his land was illegal and unenforceable: That it is the rule that all general restraints of trade are illegal, has never been doubted since the famous opinion of Lord Macclesfield in Mitchel v. Reyolds,

> Any deed, therefore, by which a person binds himself not to
> employ his talents, his industry, or his capital, in any useful
> undertaking in the kingdom, would be void.  And so far has this
> principle been carried, that even in cases in which the restraint
> sought to be imposed is only partial, it has been repeatedly held
> that such agreement will be void, unless it be reasonable and that
> no such agreement can be reasonable in which the restraint
> imposed on the one party is larger than is necessary for the
> protection of the other.

19 N.J. Eq. at 547.

More recently, in <u>Irving Investment Corp. v. Gordon</u>, 3 N.J. 217 (1949),

Meyer was the shareholder of Irving Investment Corp., which owned a commercial

building (a saloon and lodgings) at 147 Mulberry Street, Newark.  Meyer also owned a

separate hardware supply business (Newark Hardware & Plumbing Co.), which operated

across the street at 148 Mulberry Street.

Gordon operated an electric supply business next door to the commercial

building, at 145 Mulberry Street.  Anticipating an expansion, Gordon leased the

commercial building at 147 Mulberry Street from Irving Investment with a covenant that

Gordon would not compete with Newark Hardware & Plumbing within 1/8th of a mile

from the demised premises.  Gordon, however, decided to remain at his old location and

sublet the commercial premises for the existing use, a saloon and lodgings.  Irving

Investment then commenced an action against Gordon (still operating at 145 Mulberry

Street, the original location), seeking an injunction and alleging that Gordon was

competing against the hardware business in violation of the lease covenant.

On a direct appeal, the Supreme Court affirmed the trial court's decision

that the covenant was an illegal restraint on trade.  First, the Supreme Court recited that:

> As a general rule, an agreement in unreasonable restraint of trade is
> illegal and void, but an agreement in reasonable restraint of trade is
> valid. . . A restraint to be reasonable must be such only as to afford
> a fair protection to the interests of the party in favor of whom it is
> given and not so large as to interfere with the interests of the
> public.

3 N.J. at 221.

The Supreme Court then noted that Irving Investment was not a merchant or manufacturer and was not benefited by the restraint and that "[i]t is fairly clear that the main objective of the covenant was to prevent close competition with No. 148 by 147." 3 N.J. at 222. However, extending the restraint to operations at 145 Mulberry Street had gone too far:

> Irving Investment Corporation could not lawfully impose the
> named restrictions against 145 Mulberry Street, and that to the
> extent that the covenants, because of their broad language, are
> applicable to that property they are in unreasonable restraint of
> trade, invalid and therefore unenforceable.

Id.

The principle also was applied in Carlo C. Gelardi Corp. v. Miller Brewing Co., 502 F. Supp. 637 (D.N.J. 1980), in which the plaintiff claimed that its distributorship had been terminated in violation of antitrust laws and common law. On the contract cause of action, the Court noted that plaintiff claimed a right to an exclusive territory, but such a contention would have been in violation of the prevailing anti-trust laws.

> The law of New Jersey has long been clear that a contract creating
> an unreasonable restraint of trade will not be enforced. E.g. Irving
> Investment Corp. v. Gordon, 3 N.J. 217, 69 A. 2d 725 (1949).
> Moreover, in New Jersey, "It is well established that illegal
> contracts are unenforceable." Naimo v. La Fianza, 146 N.J. Super
> 362, 368, 369 A. 2d 987 (Ch. Div. 1976) (citations omitted).

-32-

> Accordingly, the contract interpretation that Gelardi seeks to enforce is unenforceable because both at the time the contract was made and at the time it was allegedly breached an exclusive territorial restriction was considered to be an illegal and, therefore, unreasonable restraint of trade *per se.*

502 F. Supp. at 652.

Likewise, in the <u>Jiffy Lube International, Inc.</u> case, discussed in Point III, the District Court held that once the protectable interest had disappeared, the restrictive covenant worked an impermissible restraint on trade.

> Once Jiffy Lube has placed a new franchisee in the Turnersville area, or sufficient time has passed to permit the establishment of a new franchisee, **Jiffy Lube's legitimate interest in preventing competition from the Weisses, under their own name or mark, essentially disappears, and the covenant becomes an impermissible restraint of trade.**

834 F. Supp. at 692.

In addition, the Appellate Division in <u>VTS Travel</u>, held that, without a protectable interest, a restrictive covenant is simply an unenforceable restraint on trade: "Judge Donahue aptly noted that courts will not enforce restrictive covenants that are 'principally directed at lessening competition' or that impose undue hardship. . . ." Appellate Division, Docket No. A-3048-03 (November 17, 2004) (Slip Op. at 9)

Thus, without any legitimate interest of its own to protect, Acme has no right to proceed to trial on the basis that the Agreement is enforceable. The naked covenant in the Agreement is a clear restraint of trade. And it is unenforceable because it is against New Jersey's public policy.

-33-

## POINT V

### SUMMARY JUDGMENT MUST BE GRANTED IN FAVOR OF J & F BECAUSE THE ALLEGED RESTRICTIVE COVENANT IS TOO VAGUE TO BE ENFORCED AND BECAUSE ACME NO LONGER HAS  A PROTECTABLE INTEREST.

The undisputed facts show that the noncompetition "agreement" which Acme seeks to enforce is so vague and lacking in essential terms that it is not enforceable.  Further, since Acme has no legitimate interest in noncompetition, enforcement of such a restrictive covenant is barred as a matter of law. Thus, summary judgment must be granted in favor of J & F.

Summary judgment must be entered if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  F.R.Civ. P. 56.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will not carry the burden of persuasion at trial, that party may either: (1) submit affirmative evidence that negates an essential element of the non-moving party's claim, or (2) demonstrate that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.  Celotex, 477 U.S. at 331.

The non-movant must then present evidence establishing that a genuine issue of material fact exists, making it necessary to resolve the difference at trial. Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985), cert. den. 475 U.S. 1013, 106 S.Ct. 1190, 89 L.Ed.2d  305 (1985).   The non-movant must present actual evidence raising a genuine issue of material fact.  Anderson v. Liberty Lobby, 477

U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson at 248. An otherwise properly-supported motion for summary judgment will not be defeated by the existence of a factual dispute between the parties unless the dispute over those facts may affect the outcome of the lawsuit. Orsatti v. N.J. State Police, 71 F.3d 480, 482 (3d Cir. 1995).

The non-movant may not simply rest on its pleadings, Celotex at 324, nor may it rely on self-serving conclusions unsupported by specific facts in the record. LaResca v. AT&T, 161 F.Supp.2d 323, 327 (D.N.J. 2001). The non-movant may not rest on unsworn argument of counsel, unsupported allegations in a brief, or conclusory allegations in an affidavit. Baer v. Chase, 2004 U.S. Dist. LEXIS 3954 (D.N.J. 2004) aff'd in part, rev'd in part, 392 F.3d 609 (3d Cir.2004). The non-movant may not rely on what "discovery could hash out" in the future but must cite to facts that already exist in affidavits, depositions, requests for admissions, and answers to interrogatories, Baker v. Office Depot, Inc., 2004 U.S. App. LEXIS 23333 (3d Cir. 2004).

In deciding the motion for summary judgment, it is not the court's role to make findings of fact, but rather to analyze the facts presented and determine if a reasonable jury could return a verdict for the non-moving party. Big Apple BMW, Inc. v. BMW of North America, Inc. 974 F.2d 1358, 1363 (3d Cir. 1992) cert. den. 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

Under these familiar standards, the motion by J & F for summary judgment should be granted because the purported restrictive covenant -- that Acme drafted -- is a

-35-

three-sentence purported "agreement" that lacks essential terms and is so vague and uncertain that its meaning can be divined only by speculation and conjecture. Thus, it is entirely unenforceable.

In addition, the undisputed facts show that, as of 2001, Acme no longer had a protectable interest -- the *sine qua non* of an enforceable restrictive covenant. Once Office Depot severed its relationship with Acme, the purported noncompetition agreement precluding J & F from dealing with Office Depot became unenforceable and, in fact, the agreement became a naked restraint of trade in violation of New Jersey public policy. There is no genuine issue of dispute concerning the facts that form the basis of this motion and the law is clear. Summary judgment should be granted in favor of J & F, and the Amended Complaint should be dismissed.

## CONCLUSION

For the foregoing reasons, J & F's motion for summary judgment should be granted and the Amended Complaint should be dismissed because the Agreement is unenforceable.

ORLOFF, LOWENBACH, STIFELMAN
& SIEGEL, P.A.
Attorneys for Defendant

By
EILEEN A. LINDSAY

Dated: July 14, 2006